AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ANTHONY VALENTO | DOCKET NO.<br><br>OCT 1 1 2013<br>CLERK U.S. DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY<br><br>MAGISTRATE'S CASE NO.<br>M 13-02757 |
|---|---|

Complaint for violation of Title 18, United States Code, Section 1001(a)(2)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALICIA G. ROSENBERG | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>August 21, 2013 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>4420 West Sarah Street, #31, Burbank, CA |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1001(a)(2)]

ANTHONY VALENTO knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to the Federal Bureau of Investigation ("FBI") in a matter within the jurisdiction of the executive branch of the government of the United States. Specifically, VALENTO falsely informed the FBI that VALENTO was not dating Gayle Bassett, an alleged victim of restraining order violations in which VALENTO was the reporting officer, and had never been anything but good friends with Bassett.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>JEFFREY M. BARTEL |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – FEDERAL BUREAU OF INVESTIGATION |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>ALICIA G. ROSENBERG | DATE<br>October 11, 2013 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Brandon D. Fox    REC: Unsecured Bond

<u>AFFIDAVIT</u>

I, JEFFREY M. BARTEL, being duly sworn, declare and state as
follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation and have been so employed since 2010.  I am
currently assigned to a public corruption squad in the Los
Angeles Field Office.  My duties include, but are not limited
to, investigating allegations of extortion, bribery, mail and
wire fraud, and obstruction of justice.

2.    This affidavit is made in support of an application
for:

a.    Complaints and arrest warrants charging GAYLE
BASSETT ("BASSETT") and ANTHONY VALENTO ("VALENTO") with making
materially false statements to the FBI in a matter within the
jurisdiction of the executive branch of the government of the
United States, in violation of Title 18, United States Code,
Section 1001(a)(2); and

b.    Search warrants of: (1) the residence of BASSETT,
4420 West Sarah Street #31, Burbank, CA 91505 (the "Premises");
and (b) the person of VALENTO ("VALENTO").

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, my review
of recorded conversations, and information obtained from various

law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  My descriptions of recorded conversations are summaries based on my review of the recordings.  These descriptions are not based on final, verbatim transcripts, even where I have provided quotes.  In places within this affidavit, I have indicated my understanding of some recorded statements, including in brackets within certain quotes.  These statements are based on the context of the recorded conversations and information I have learned in the investigation.

## II.   PREMISES AND PERSON TO BE SEARCHED

4.   The Premises to be searched is the residence of GAYLE BASSETT, which is located at 4420 West Sarah Street #31, Burbank, CA 91505.

5.   The person to be searched is ANTHONY VALENTO, who is a police officer with the Burbank Police Department ("BPD"). According to telephone records, VALENTO is the subscriber of the phone number 818-438-7997 ("VALENTO's Phone").

### III. STATEMENT OF PROBABLE CAUSE

6.   As described below, there is probable cause to believe: (a) that BASSETT and VALENTO have made materially false statements to the FBI in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of Title 18, United States Code, Section 1001(a)(2); (b) that VALENTO has committed wire fraud, in violation of Title 18, United States Code, Section 1343; (c) that VALENTO has committed federal program bribery, in violation of Title 18, United States Code, Section 666; and (d) that evidence and instrumentalities of those crimes, as described in Attachments B-1 and B-2 which are incorporated by reference herein, is located at the Premises and on the Person to be Searched.

7.   Cooperating Witness ("CW") is BASSETT's husband and is the defendant in a criminal case that charges CW with domestic abuse against BASSETT.[1]  The two have separated and are involved in divorce proceedings.  On or about July 25, 2013, CW reported to the FBI that BASSETT and VALENTO were extorting CW by seeking

---

[1] According to a review of CW's criminal history report, CW was charged with inflicting corporal injury on spouse or cohabitant and with threatening a crime with the intent to terrorize on September 26, 2012.  According to California Penal Code 273.5(a), the maximum term of imprisonment for this offense is four years and the maximum fine is $6,000.  CW was also charged with contempt for disobeying a court order on December 18, 2012.  His criminal history report does not list any other charges, although I know that he was arrested as a juvenile.  The FBI has not fully vetted CW and I make no representations about the credibility of the information he has provided to the FBI.  I am including CW's statements not so that the Court relies upon them, but instead to allow the Court to understand the allegations that the FBI is investigating.

money from him in the divorce proceedings in return for amending and/or dropping the pending domestic violence charges and the related restraining order violations against CW in which VALENTO was the reporting officer.

8.      According to CW, in approximately April 2013, BASSETT told CW that it was up to him whether he went to jail and offered to have the criminal charges against him dropped if he paid her $250,000 as part of a divorce settlement.  CW stated that, on or about April 15, 2013, VALENTO called CW and said that if CW gave BASSETT $100,000, then VALENTO (the reporting officer on CW's restraining order violations) would speak to the district attorney to have the charges at least reduced from felonies to misdemeanors.  CW said that VALENTO informed CW that for an additional $15,000 or $20,000, VALENTO could probably get all of the charges dropped.

*Summary of the Bribery, False Statements, and Fraud*

9.      Since CW reported his complaint to the FBI in approximately July 2013, the FBI has been investigating whether VALENTO was corruptly seeking money for himself and/or BASSETT in exchange for being influenced in his official duties.

10.  As part of the investigation, the FBI interviewed BASSETT and VALENTO, in part, to determine the relationship between the two.  Specifically, on August 21, 2013, FBI Special Agents Leah Marx and Jason Dalton interviewed BASSETT.  On the

4

same day, Special Agent David Dahle and I interviewed VALENTO. In summary: (a) BASSETT and VALENTO denied having a romantic relationship, (b) BASSETT and VALENTO stated that VALENTO did not live at the Premises; (c) BASSETT claimed that she never said that she would drop the charges against CW in exchange for money; and (d) BASSETT denied that BASSETT had ever threatened CW. These interviews are detailed further in paragraphs 71 and 72.

11. Despite these denials, the investigation has shown that: (a) VALENTO and BASSETT have a romantic relationship; (b) VALENTO lives with BASSETT at the Premises, (c) BASSETT has told CW that she would drop the charges in exchange for money; and (d) BASSETT has threatened CW. Further, evidence shows that VALENTO has a financial relationship with BASSETT in that VALENTO supports BASSETT and her children financially, has paid for elective surgery for BASSETT, and has co-signed on the lease of BASSETT's car.

12. The investigation has further revealed that VALENTO has falsified records with BPD to make it appear as though he was working at times when he was not. In many instances, instead of working, VALENTO was at the Premises.

*CW Charged with Domestic Violence and Restraining Order Violations; VALENTO Is Reporting Officer for the Violations*

13.    Based on the police reports I have reviewed, BPD was the arresting agency on the domestic violence charges and subsequent restraining order violation charges filed against CW. As shown below, with respect to at least some of the alleged restraining order violations, VALENTO was the officer responding to and reporting the alleged violations.

14.    According to BPD records, BASSETT reported a domestic violence incident on September 26, 2012.  BASSETT stated that CW threw a bottle and bottle opener at BASSETT, choked BASSETT, and threw her to the ground.  According to the report, BASSETT alleged that CW held a broken bottle to his neck, used it to cut his arm, and stated that he was "going to kill" himself and BASSETT.  The officer reporting the incident indicated that he observed redness on BASSETT's neck.  The officer entered their home, which was then located at 4224 West National Avenue in Burbank (the "National property") and observed a scene that was consistent with BASSETT's account.  Another officer noticed injuries to CW's arm and neck that were consistent with BASSETT's claim.  CW was arrested that night.  I have not interviewed CW about this incident in detail because he is represented by an attorney in his ongoing criminal case.

15. Although VALENTO was not involved in the reporting of this domestic violence incident, BPD records show that VALENTO began reporting violations of a restraining order against CW that stemmed from CW's criminal charges.

16. According to one of VALENTO's reports, BASSETT contacted VALENTO at the "BPD front counter" at "18:00" (6:00 p.m.) on November 1, 2012 to report two violations: (1) that CW had allegedly followed her and their children while they were trick-or-treating on October 31, 2012; and (2) that BASSETT encountered CW in the rear entrance of the Department of Children and Family Services on November 1, 2012. Although VALENTO said that BASSETT reported these violations to him at the BPD front counter at 6:00 p.m., VALENTO's log of his daily activities does not indicate that this interaction occurred. Instead, it shows that VALENTO arrived at the station at 5:40 p.m. and from that time until 6:10 p.m., he was involved in "briefing, vehicle prep." The daily log indicates that from 6:10 p.m. until 7:00 p.m., VALENTO was working on "equipment." The daily log lists names of individuals VALENTO encountered that day, but it does not list BASSETT. Further, each BPD officer is equipped with a recording device that the officer generally is supposed to use during conversations with individuals involved in domestic violence incidents. According

7

to BPD records, VALENTO did not record this encounter with
BASSETT.[2]

17.  BPD records also show that VALENTO was the reporting
officer in BASSETT's complaint that CW allegedly violated the
restraining order on November 2, 2012.  According to BPD
records, BASSETT stated that her babysitter reported that CW had
violated the restraining order by going to the National
property, where BASSETT was then living.  BPD records show that
two officers and a helicopter responded to the scene, but that
none of these responding officers wrote a report.  Instead, BPD
records show that VALENTO authored a report about the incident
at a later time.  According to that report, VALENTO interviewed
BASSETT and the babysitter.  VALENTO's report indicates that the
babysitter stated that he observed CW's mother standing on the
front porch of the National property and CW standing on the
sidewalk in front of the residence.

18.  BPD records show that VALENTO was the reporting
officer with respect to another alleged violation of the
restraining order by CW on November 5, 2012.  Similar to the
November 2, 2012 incident, two officers were dispatched to the
house that night, but did not write a report.  Instead, BPD
records show that VALENTO "broadcast that he would replace" one

---

[2] On August 11, 2013, CW recorded a conversation with VALENTO in which
VALENTO informed CW that VALENTO had recorded his interviews of CW.  VALENTO
told CW that "we record everything.  We're supposed to."

of the officers, and that he and Sergeant Michael Parrinello responded to the scene.  According to VALENTO's report, CW's mother had changed the locks on the National property and refused to provide BASSETT with a key.  In the report, VALENTO stated that a witness saw CW drop his mother off in front of the National property and then drive away.  VALENTO wrote in the report that it was his "opinion" that CW's mother was "acting on [CW's] behalf to harass and disturb the peace of [BASSETT], in direct violation of the restraining order.  There does not appear to be a valid reason for [CW's mother] to reside at the home."

19.  BPD Officer Katherine McDonald recalled responding to a domestic disturbance call between a mother-in-law and daughter-in-law, which appears to me to be the November 5, 2012 incident.  McDonald stated that VALENTO arrived at the scene a short time later and told McDonald that the mother-in-law and her son were "crazy."  McDonald said that VALENTO told McDonald not to worry about it and that VALENTO "would handle it." According to McDonald, she was upset with the way VALENTO dealt with the situation because she felt VALENTO was on the daughter-in-law's side without knowing all of the facts.

20.  Based at least in part on VALENTO's reports, the Burbank City Attorney's Office filed three restraining order violation counts against CW.

9

*VALENTO Pulls Over CW's Mother in Effort to Find CW*

21.   According to CW's mother, she was driving near CW's residence at approximately 10:30 p.m. on December 17, 2012, and noticed a police car, which she later learned was driven by VALENTO, following her.  CW's mother stated that as she neared CW's residence, VALENTO pulled her over and stated that he was looking for CW.

22.   According to BPD records, officers arrested CW for his alleged restraining order violations on December 18, 2012.

*VALENTO Submits Reports Claiming that CW Violated Restraining Order Through Facebook Posts*

23.   BPD records show that VALENTO was the reporting officer for alleged restraining order violations based on Facebook posts CW made in December 2012.  According to VALENTO's report, he stated that BASSETT sent him "several email messages" complaining about these posts.  According to BPD, however, it was unable to locate these emails in VALENTO's BPD account.[3] VALENTO's report further states that he spoke with BASSETT on the telephone about her complaints.  VALENTO wrote in the report that the first post was on December 28, 2012, and that it stated, "Don't get married people!!! Especially a gold digger who ... lies like a demon in heat."  According to VALENTO's report, BASSETT "was offended and felt harassed" by this post.

---

[3] BPD is looking into whether these emails exist on its server but were deleted out of VALENTO's active email account.

VALENTO wrote that the second post occurred on December 31, 2012.  In that post, CW referred to BASSETT as "a slutty blonde greedy habitual lying waitress" and accused Basset of "[s]crewing paralegals, Dj's [sic], guys who try out for my band, random acts of attention whoring."  VALENTO's report noted that the post accused BASSETT of "taking all our kids [sic] college funds."  VALENTO stated in the report that BASSETT "was disgusted and extremely upset about this posting" and believed it was done by CW "to harass and annoy her."  VALENTO's report indicated that BASSETT was "desirous of prosecution."  According to the report, VALENTO placed a recorded telephone call to CW and told CW that "the postings were a violation of the criminal protective order."  VALENTO concluded the report by stating that it was VALENTO's "opinion" that CW "violated the criminal protective order by initiating several Facebook posts directed at GAYLE [BASSETT].  The posts were clearly demeaning, insulting, and harassing in nature."  According to BPD records, the Burbank City Attorney's Office declined to file charges against CW based on this conduct.

*VALENTO Moves Out of His Home and Into the Premises*

24.  On September 26, 2013, I interviewed Staci Valento ("Staci"), who is the current wife of VALENTO.  According to Staci, she is in the process of filing for dissolution of her marriage with VALENTO.  Staci said VALENTO has known BASSETT

since mid-2012, when he began taking exercise classes that were taught by BASSETT. According to Staci, who also was a member of the gym where BASSETT taught her classes, BASSETT began asking Staci if Staci, VALENTO, BASSETT, and CW could socialize together. Staci said that the only time the four of them socialized was on Staci and VALENTO's anniversary on September 22, 2012 (which was four days before the alleged domestic violence incident). On this occasion, they went out to dinner and then back to the National property, according to Staci.

25. Staci stated that she started to believe that VALENTO was having an affair in October or November of 2012, when he, among other things, began to not come home for some nights or for work breaks. According to Staci, she began to suspect that BASSETT was the woman VALENTO was having an affair with in December 2012 because VALENTO knew more about what was happening with BASSETT and at the gym than Staci knew. Staci stated that Valento moved out of their home in February or March 2013.

26. Staci informed me that her suspicions were further raised when she learned of Facebook postings that VALENTO was making on BASSETT's Facebook page that discussed, among other things, what an inspiration BASSETT was to VALENTO. Staci said that in April 2013, she learned that VALENTO was on injured-on-duty status, and therefore on paid leave, yet was departing their house as though he were going to work. According to

Staci, she began to notice that VALENTO's car was often parked outside of the Premises in May through June 2013.  Staci stated that she also learned that VALENTO had come back days' early from a trip he was on without telling Staci.  Despite returning early, he did not go to their home, according to Staci.  Indeed, Staci said that she only learned that VALENTO had come back early when she saw airline records reflecting the change in dates.

27.  According to Staci, VALENTO has moved out of their home on Parish Place in Burbank ("Staci's residence"), although he still pays for their mortgage.  Staci stated that VALENTO will occasionally tell her that he is dropping by the house to pick up items or see the kids.  On these occasions, Staci will spend the night elsewhere.

*VALENTO and BASSETT Co-Sign Lease in February 2013*

28.  Staci said that she has received mail at Staci's home that reflects BASSETT's address at the Premises.  Staci stated that license plates for BASSETT's new car, which she recalled as being a Kia, were mailed to her earlier this year.

29.  I have reviewed Hyundai records, which show that VALENTO and BASSETT co-signed a lease of a Kia Sorrento on February 6, 2013.  VALENTO is listed as the "applicant" and BASSETT is listed as the "co-applicant."  The application states that VALENTO and BASSETT live together, but lists their address

13

as Staci's residence and not the Premises.  The application states that BASSETT has lived at Staci's residence for a month. The application lists the Premises as BASSETT's previous address, although it does not list an apartment number.

30.  Despite VALENTO's and BASSETT's representations on the application that they live together at Staci's residence, Hyundai records reflect that the payments for the lease generally have come via Western Union Speedpay and list the Premises as their address.

**Text Messages Between CW and VALENTO Prior to CW's Cooperation with Law Enforcement**

31.  BPD-IA captured screen shots of text messages between CW and VALENTO's Phone.  Those text messages, which I have reviewed, reflect that CW and VALENTO were communicating about BASSETT and VALENTO talking to the district attorney ("DA") prosecuting CW's criminal case:

a.  On June 4, 2013, CW sent VALENTO a message stating that CW's next court date was June 10.  CW said that it "would be good if you and GAYLE [BASSETT] go and speak to the DA that morning."

b.  On June 10, 2013, CW sent VALENTO a message stating, "Department f, 5th floor.  DA is not here yet."  CW received a response from VALENTO's Phone stating, "[w]e are waiting on the da [sic]."

14

c.   On June 26, 2013, CW received a message from VALENTO asking, "What happened with court today? Sorry we couldn't make it but we will definitely talk to da [sic] ASAP."

*Recorded Conversations between CW, BASSETT, and VALENTO*

32.   Beginning near the end of July 2013, CW agreed to record conversations with BASSETT and VALENTO at the request of the FBI so that the FBI could determine whether VALENTO and BASSETT were extorting CW by promising that VALENTO and BASSETT would influence the DA to drop or reduce the charges against CW if CW paid BASSETT a certain amount of money.

*VALENTO Ties Divorce Settlement Payment to Discussions with DA's Office, Denies Romantic Involvement with BASSETT*

33.   On or about July 27, 2013, CW recorded a telephone call with VALENTO on VALENTO's Phone.  In that recording, VALENTO stated that BASSETT wanted to handle things "more businesslike."  VALENTO said that "we're still talking to the DA's office" and that BASSETT was "still going to honor, uh, her side of it.  She's going to try to make a deal with you.... She's going to talk to the DA and see what can happen there."[4] CW asked if BASSETT wanted "more than a hundred thousand dollars?"  VALENTO responded, "It's more than that ... but it is not a whole lot more."  When CW stated that "you guys already

---

[4] Within this affidavit, I have included references to BASSETT talking to the DA because it is relevant to the false statements violations and VALENTO talking to the DA because it is relevant to the bribery violation.

15

told me a hundred thousand dollars," VALENTO replied that

"there's a tremendous value with you ... getting it done ... and

getting the criminal case done."  VALENTO stated that "it's not

200,000.  It's somewhere in between ... and, uh, yeah, she's

absolutely, I am absolutely going to talk to the DA.  Um, that's

not in question.  That's part of the deal, that we're going to

go talk to her, um, and see what [the DA's] willing to do."

34.   In the same recording, CW stated that "before it was

like 99% sure that I can get this case dropped ... if I give

that amount.  And now it's like - now it's 50/50.  And now it's

[sic] she says maybe I'll think about it.... Now it's like ...

you guys are going back on the whole deal that you guys

presented me with."  VALENTO responded that "the deal's the

same.  Um, it's just ... being negotiated.... The only thing

that's gone back and forth is ... how [BASSETT] wanted to

proceed with prosecution."  VALENTO continued that BASSETT wants

CW "to suffer in ... in some degree.  I'll be honest with you."

35.   During the conversation, CW asked VALENTO to "be

straight up" about his relationship with BASSETT.  VALENTO

stated that BASSETT was "absolutely not interested in any type

of relationship with anyone, including me."  VALENTO said that

although he does spend some nights at BASSETT's home, he uses an

"air mattress" and that there was "no physical relationship."

CW asked about BASSETT's "breast implants."  VALENTO responded

that BASSETT "doesn't have, uh, breast implants as far as I

can ... as far as I know.  Um, and I think I would know."

36.  In a separate recorded telephone conversation on

VALENTO's Phone that night, CW asked VALENTO about "the DA

situation.  Like if I give her this much money, if I don't give

her that money ... she's going to make sure I go to prison."

VALENTO responded that if CW did not "make a deal" with BASSETT

then "she's going to - she's going to go full out with the DA."

VALENTO stated that if CW gave "her money ... she makes a deal

with the DA.  She's willing to negotiate, I know that."  VALENTO

stated that this was "still a fluid situation."  VALENTO

instructed CW to "let us [VALENTO and BASSETT] sit down and talk

with the DA and see what the DA is willing to do."  VALENTO

reiterated that "we're going to talk to the DA here.  She's

nice ... I'm going to talk to her.  It is going to happen in the

next few weeks."

### VALENTO and BASSETT learn of BPD Internal Affairs Investigation of VALENTO, ask CW to "Clarify" Issues in that Investigation as Part of their Deal

37.  According to BPD-IA Lieutenant Kevin Grandalski, the

restraining order violations against CW were dropped on or about

July 30, 2013, based on BPD-IA discovering the relationship

between VALENTO and BASSETT and concerns about a conflict of

interest.  According to BPD records, VALENTO was placed on

administrative leave pending the results of an internal affairs

investigation on July 31, 2013.  Details regarding that
investigation are listed below in paragraphs 67 to 70.  Although
BPD records show that the investigation originated from a
complaint by a BPD Lieutenant, recorded conversations show that
VALENTO and BASSETT blamed CW for the investigation.

38.  CW recorded a brief meeting that he had with VALENTO
and BASSETT on August 1, 2013.  During that encounter, BASSETT
stated, "Whatever you guys are up to, you just made things a lot
worse for yourself."  VALENTO added, "It's not going to work."
In a later recorded telephone conversation on VALENTO's Phone,
CW denied reporting VALENTO to BPD.  VALENTO said that he did
not want to "talk about it over the phone" and that he would
talk to CW about it "in person."

39.  On August 1, 2013, BPD-IA officers went to CW's home
to interview him.  Afterward, CW recorded a meeting with BASSETT
and VALENTO.  At the beginning of the meeting, VALENTO and
BASSETT instructed CW to turn off his phone.  VALENTO stated
that this was "so nobody's recording anybody."  VALENTO said
that he was "going to assume you don't have a secondary
recorder."  BASSETT asked, "You're not recording anybody?"  CW
responded, "Of course not."  CW stated that "IA just left my
house."  CW said that BPD-IA informed him that the officer had
"talked to [BASSETT] yesterday."  BASSETT replied, "Yeah, they
came by my house."

40.  During the same meeting, BASSETT informed CW that she would go to his next criminal court appearance on August 6, 2013 to "talk to the DA." BASSETT said that VALENTO "has told me that I need to go ahead and do this deal [money for dropping criminal charges]. It was his [VALENTO's] idea, the deal. I wanted you in jail. I wanted you to get ass-raped by an AIDS infected big black guy." After CW repeated this last comment, BASSETT responded, "yes. That's how I feel. Okay? And he [VALENTO] has told me I need to make this deal. It's the best for the kids." BASSETT stated that "my wanting you to go to jail never changed.... But I'm willing to go there on the 6th and I'm willing to work this out, but ... this [the BPD-IA investigation] has got to be clarified." BASSETT added, "If I hear that it's straightened out, things will be fine." BASSETT told CW that "nobody would have any idea of him [VALENTO] and I ... having a relationship except for you or anybody in your circle." BASSETT told CW that he could "help the situation kind of, you know, be cleared up. By clearing up the fact that it really wasn't a biased thing at all.... and him [VALENTO] and I have no relationship except for being friends." I understand BASSETT to be telling CW to tell BPD-IA that: (a) VALENTO and BASSETT have no romantic relationship; and (b) that VALENTO did not act biased toward CW with respect to the restraining order violations.

41.   Near the end of the meeting and despite BASSETT asking CW to inform BPD-IA that VALENTO was unbiased, VALENTO told CW, "I don't particularly like you." After VALENTO repeated the statement, CW asked, "You don't like me?" VALENTO responded, "Yeah.  But I'll deal with things to get this deal done for all of you."  At the end of the meeting, VALENTO, outside of BASSETT's presence, told CW, "[o]bviously her and I are together, you know that, right?"  CW asked why VALENTO had not told him the truth previously.  VALENTO responded, "There's a lot of things involved with it.  Okay?  Clearly, you know.  Do I have to tell you that her and I are together?"

### BASSETT Tells CW about Individual with Tattoos Who Has Been to Prison and Who May Pay CW a Visit

42.   On August 4, 2013, CW recorded a meeting with VALENTO and BASSETT.  BASSETT met with CW first and told CW that there was somebody who "really cares about me" who CW would meet "after all this is over."  BASSETT said that this individual "was upset" that BASSETT was "stressed out right now."  BASSETT stated that CW would "meet him," but that she did not want CW to meet the individual "before this was all over.  That would be a bad thing."  BASSETT told CW that "if anything happens to me or my reputation.... he's not going to be happy."  BASSETT said that she was "not threatening" CW.  BASSETT informed CW that the individual "has tattoos all over his arms" and that the

individual was "upset right now." CW asked if BASSETT thought
that CW was scared of "some guy." BASSETT responded, "It's not
some guy. It's not just some guy." BASSETT said that the
individual wants to "stay out of legal stuff, away from legal
stuff," but that he was "part of a family that, uh, doesn't want
to be around legal stuff." CW stated that if this individual
came after CW, he would "probably find himself in prison then."
BASSETT laughed and responded, "He's already been to prison ...
and he has lots of friends in prison right now." BASSETT
reiterated that this individual "cares about me and doesn't want
to see me upset or my reputation or my job threatened in any
way." BASSETT said that if her reputation is ruined because of
an investigation, "I'm going to be upset and he's [the
individual's] going to be upset." BASSETT then walked away.

### VALENTO Discusses BASSETT's Comments, Their Romantic and Financial Relationship, the Deal, and What CW Should Tell BPD-IA

43. After BASSETT walked away, VALENTO approached CW. CW
mentioned what BASSETT had just said about "this guy with
tattoos who is basically going to come kill me." VALENTO
responded, "I have no idea what she just told you." CW said
that "making death threats is not a good idea for either of you
right now." VALENTO replied, "I didn't know anything about it.
I don't even know what she said. I'll ask her about it, but I
don't want anyone making threats right now." VALENTO said,

"Obviously ... I have a relationship with her. That doesn't mean that I haven't held to this deal and haven't been upfront with the deal every step of the way." VALENTO stated, "I've been nothing but fucking helpful in this deal and this deal is going to happen because I'm involved." VALENTO then referenced BASSETT's separate conversation with CW at the beginning of the meeting and said, "She didn't tell me what the fuck she was going to talk about. She goes, 'I'm going to talk to him about something private and I don't want you to know about it.' Obviously now I know why she didn't want me to know about it." VALENTO said that this "makes sense" and that VALENTO did not "want to be involved in it." VALENTO stated again that he has been "up front and honest with the deal from day one. The only thing I wasn't upfront and honest with was my relationship with her." VALENTO said that BASSETT would still "deny" the relationship because "she thinks she has to" based on the "police investigation." CW stated that VALENTO has not been up front and honest about "the deal." VALENTO responded:

> We've gone back-and-forth on that. We've never lied. She started out on one amount and wanted jail time. Then she backed off on jail time. Then she said, "Okay, maybe I'll reduce the felony to a misdemeanor." It's rotated around from one thing to the next. It's never been a flat out, "well, this is absolutely what we're going to do." She was set on one thing, but it's changed a little bit.

44. CW mentioned that VALENTO had told CW, "for an extra fifteen or twenty thousand dollars, I [VALENTO] can talk to the

DA because I know him and, yeah, I can get everything completely done with if you give us that." VALENTO replied, "Yeah, that is what we were going to ask. But we haven't even had the deal close to being signed." CW stated that at one point they were "going to do everything under the table and that would be the deal." VALENTO responded, "I still think that was the best way."

45.   Later in the conversation, VALENTO stated that CW "might have some hard feelings" about VALENTO's relationship with BASSETT. VALENTO added, "I get her new boobs. I don't know, maybe you're offended by that." VALENTO stated that "our relationship is ... one thing she's not going to admit to and I'm not going to admit to." VALENTO said that he could tell BPD-IA about their relationship, "but I'm not going to. Because there's no reason to." CW stated "so that means you want me to lie to them then and tell them that you are not together." VALENTO asked, "Do you know that we're together?" CW replied, "Well, yeah, you told me." VALENTO asked, "Do you know otherwise?" VALENTO continued, "All you have to say is, 'I don't know.'" CW asked if VALENTO "live[s] there now?" VALENTO responded, "No. Do I stay there? Yeah." VALENTO stated that he would inform BPD-IA that he stays at the Premises, but that BPD-IA would not get "the information they want" unless CW was "wired right now and they, they hear me saying I'm dating, fuck

23

it, I don't care." VALENTO said that he and BASSETT, however, were not dating "when the case was filed." VALENTO stated, "I'm assuming you are not wired."

46. Continuing the conversation, VALENTO and CW discussed the deal. VALENTO said, "They switched DAs. You know we went down to the courthouse. Uh, switched DAs. I talked to this DA.... It is going to happen." VALENTO stated "I'm not going to get rich out of it. I have my own money." VALENTO discussed how expensive BASSETT and CW's kids are and said, "I'm buying them groceries" and that VALENTO was "buying her [BASSETT] stuff." CW mentioned his support payments to BASSETT of "$4,600" a month. VALENTO stated, "I splurged on one fucking thing [her breast augmentation]. Okay? I like 'em. She likes 'em. They are fun. I had extra money. My daily budget is not $8,000 for boobs. That was a splurge." VALENTO said that he has to buy groceries because BASSETT "has no money." VALENTO stated that BASSETT "doesn't buy new clothes" and that the "new clothes that she has gotten recently" were because she had "obviously changed a little bit and I, uh, I'll take care of it." I understand VALENTO to mean that he would pay for BASSETT's new clothes that were necessary to purchase because of her breast augmentation procedure.

47. CW recorded a meeting with VALENTO and BASSETT on August 5, 2013. During the meeting, CW told VALENTO that he

believed that CW was being followed by BPD.   VALENTO stated, "As I said, it would be in our best interest to, uh, rid ourselves of this issue [the BPD-IA investigation of VALENTO].   Neither one of us wants the attention."   CW raised BASSETT's comments about the tattooed-person from the previous day and stated, "I don't like whatever GAYLE [BASSETT] is threatening with this guy ... so I want you to find out who this guy is."[5]   VALENTO responded, "I'll talk to you about that, but, uh, I need to know, you know, uh, what's going to happen with this investigation."   I understand VALENTO to mean that he would provide information to the CW on the condition that the CW gather information about BPD-IA's internal investigation for VALENTO.   VALENTO continued that he needed to know how the restraining order violations against CW were "dropped and what they told you."   VALENTO stated that "I've done nothing but help here.   But, uh, that's why we need to straighten it out."   When CW asked what VALENTO meant, VALENTO stated, "we'll work on what we're working on [the divorce settlement and CW's criminal

---

[5] In the same conversation, CW informed BASSETT that he wanted her to tell him who she was alluding to in her threats.  BASSETT said that she was "not threatening" CW and that she has "never made any threats."  CW asked BASSETT to "tell me who the guy is if it is not a threat."  BASSETT said that she did not know what CW was "talking about."  When CW later said that she had lied to him, BASSETT stated that CW was "trying to involve me in a discussion that I don't want to be involved in .... I'm not going to talk about that anymore."  VALENTO responded that "[n]obody's going to do anything to" CW.

case]. But we can't do it with this shit [the BPD-IA
investigation] hanging over everybody's head."

48.   During the same meeting, VALENTO stated that CW has
"an interest in this as well because your DA case is still
pending.... And I'm not, I'm not threatening that.   I'm just
saying, you know."   VALENTO stated that they had "met with the
DA" previously and that they were going to "meet with the new
DA" but "with all this shit going on, it's going to be delayed
until we figure some things out" such as "how the case was
dismissed" and "what they [BPD-IA] told" CW.   VALENTO said that
after this, "we will work on our end."   VALENTO continued to
connect the outcome of the BPD-IA investigation to CW's criminal
case by stating that:

> [CW] might relish in the fact that, now, there's this
> investigation going on, but you still have something going
> on in this, too, that you want.   So, uh, if you didn't have
> anything going on, you could say, "fuck us [BASSETT and
> VALENTO]."   But, you know, I don't think that's a good
> idea.   You say, "Fuck us," then we're going to say, I mean,
> you know, she's probably going to say, "Fuck you."   And
> that's not good.... I'm still trying to work with you on
> this man.... This is business.   For both of us.

49.   In the same conversation, BASSETT stated that VALENTO
has been helping "all of us."   BASSETT said that an example of
this was that VALENTO paid for BASSETT and CW's daughter's
"dental appointment."

50.   Later on August 5, 2013, CW recorded a telephone call
with VALENTO on VALENTO's Phone.   CW told VALENTO that CW's

lawyer informed him that the DA dropped the restraining order violation "because there's not enough evidence." The two then discussed the BPD-IA investigation. VALENTO informed CW that BASSETT has told BPD-IA that VALENTO and BASSETT were just friends.[6] VALENTO told CW to tell BPD-IA "the truth ... so we're satisfied that you're just not going to throw me under the bus, um, because then she's going to throw you under the bus ... it's not a threat or anything. It's just that you know that's what's going to happen." VALENTO stated that at the beginning, he viewed CW as "a threat" to BASSETT but that he has not believed that CW was a threat to her "for some time." VALENTO then discussed the "two-part" deal that VALENTO and BASSETT "brought to you as a possibility":

> It's a two part deal: your side and her side.... this whole thing was brought to you from us as a possibility ... you haven't completed your side and I know for a number of reasons we haven't completed our side for a number of reasons. So the goal is still the same. It never changed. We went to the DA that one day she wasn't there ... you know I've been in contact with the new one on [BASSETT's] behalf and ... [BASSETT's] probably going to go in on Wednesday.... It's been delays for one reason or another,

---

[6] BPD-IA Sergeant Scott Meadows and Lieutenant Kevin Grandalski interviewed BASSETT at the Premises on July 31, 2013. According to those officers, BASSETT stated that (a) she and VALENTO "are close friends, and are in no way involved in a romantic relationship"; (b) VALENTO stops by once or twice per work shift to check on her and "occasionally" eat a meal, but he spends no more than an hour at a time at her residence and no longer than his meal break allows; and (c) VALENTO lives with his wife. According to those officers, BASSETT informed them that she last saw VALENTO at her house that morning. When they informed BASSETT that they saw VALENTO at her residence 15 minutes before they arrived at the Premises, she said that she had forgotten about that until they reminded her.

but the goal is still the same that, uh, assurance is still the same.

51.   I understand VALENTO to mean from these comments that he and BASSETT presented CW with a deal that would require CW to pay money to BASSETT and, in exchange, BASSETT and VALENTO would speak to the DA on CW's behalf.   VALENTO informed CW that it was VALENTO's opinion that he has been "nothing but helpful to" CW. CW pointed out that VALENTO "did tell me that if I don't take that Facebook comment down, you're going to come arrest me." VALENTO responded that his threatened arrest of CW was for "your benefit."

52.   CW recorded a meeting with VALENTO and BASSETT later on August 5, 2013.   In that meeting, CW informed them that he was going to talk to BPD-IA later in the week.   VALENTO said that he and BASSETT were "going to the DA tomorrow.... To do, uphold, uh, you know, what we, what we talked about.... So we're ... we'll get that ball rolling."

53.   CW's phone shows that on August 6, 2013, CW received a text message from VALENTO's Phone.   The text message stated that VALENTO and BASSETT "[s]poke to da [sic] that's what I wanted to talk to you about."   The message stated that they "were there at 1045 [sic] to noon" and that the DA and BASSETT spoke "for a half hour while I [VALENTO] watched kids."

54.  On August 7, 2013, CW recorded a conversation with
VALENTO on VALENTO's Phone.  VALENTO said that he "just want[ed]
to make sure that, uh, you got, uh, word that we were there."
VALENTO stated that "we had a hell of a fucking time finding"
the DA.  VALENTO informed CW that, when they did talk with the
DA, "she was done with court for the day.  She talked to
[BASSETT] for quite a while.... I just introduced them and just
let them talk."  VALENTO stated that VALENTO had "already talked
to the DA briefly on the phone."  VALENTO said that the DA
informed BASSETT that she would "not drop the case" until the DA
"at least read" the file.  VALENTO informed CW that the DA "told
[BASSETT], 'with all due respect, you know, um, if the case is
going to be dropped it's going to be, um, coming from the DA and
not the victim.'"  VALENTO stated that the DA informed BASSETT
that "you can tell me what you want" but that the DA can "force
[BASSETT] to testify and impeach [BASSETT] and all that stuff."
I understand VALENTO to be telling CW that BASSETT informed the
DA that BASSETT wishes to drop the charges, but that the DA is
unwilling to do so without reviewing the file.  VALENTO then
discussed the deal again, stating that "the goal has never
changed" and that was "to get the two things that we've always,
the thing that you want and the thing she wants, um, and get the
deal done."  I understand VALENTO to mean that the goal is still

to have BASSETT influence the DA to drop the charges in exchange for money in the divorce case.

55.   Later in the conversation, VALENTO reiterated that "we're upholding, you know, what we've always said we're going to do even though maybe it was delayed," but that "we expect, you know, you and your mom to, you know, be fair when it comes to my situation."   VALENTO said that there would be "a time" when BASSETT "meets with the DA again and, you know, obviously bases it on a lot of things including, you know, if people are fair with me."   VALENTO stated that BASSETT was "holding back" to "make sure the deal's on track, make sure that my thing's, uh, being done fairly."

56.   CW recorded a conversation with VALENTO on VALENTO's phone later on August 7, 2013.   During the conversation, VALENTO told CW that BASSETT wanted CW to speak with BPD-IA in the near future and that BASSETT would "base her decisions with the DA based on what you tell my people [BPD-IA]."   CW asked what BASSETT wanted CW to say to BPD-IA about BASSETT and VALENTO's "personal relationship."   VALENTO responded:

> I can assure you that we were not involved in any way shape or form ... for 7-8 months or 6-7 months, whatever it was. Um, did we have somewhat of a relationship? Yes, we had somewhat of a relationship.  Um, *but you don't know that, and she denies it.*

(emphasis added)

30

57.  In the same conversation, VALENTO stated that BASSETT "expects you to do what we're wanting you to do" and stated that BASSETT expected CW to pay "150 [$150,000]." VALENTO said that "she and I told you this from the beginning."

### CW Encounters VALENTO and BASSETT on Street

58.  CW recorded an encounter he had with VALENTO and BASSETT, who were walking together, in the evening of August 7, 2013.  The three discussed having a drink in the future, the BPD-IA investigation, and who was babysitting CW and BASSETT's children.  Based on my review of this recording, they did not talk about CW's criminal case, whether BASSETT would speak to the DA, what would happen to BASSETT if she did not speak to the DA, or whether CW would flee if he were convicted.

59.  A few hours later, CW called VALENTO on VALENTO's Phone and recorded the conversation.  CW asked why VALENTO was "driving past" CW's house.  VALENTO initially denied driving past CW's house, but later admitted to doing so.  VALENTO stated that their earlier encounter was a "violation of the restraining order."  CW said that VALENTO had "gone too far" and that CW was "paranoid," "emotionally distressed," and "suicidal."  VALENTO said that BASSETT was not going to "report" any restraining order violation and that he "promise[d] [CW] that."  VALENTO said that CW would not "go to prison.  We want this to work out the way it's supposed to work out.  I promise you that."

60. On August 9, 2013, CW called VALENTO on VALENTO's
Phone and recorded a conversation.  CW asked if VALENTO and
BASSETT would "be all right with a payment plan."  VALENTO said
that BASSETT "is all right with that."  CW mentioned that
VALENTO "said before that you were going to personally talk to
the DA ... now only she's talking to the DA."  VALENTO
responded, "No, I spoke to the DA on the phone for 20-30
minutes.  Um, and I talked to her at length.  This time around,
I talked to the DA ... and told her, uh, a little bit about it."
VALENTO stated that he had "talked to her for five minutes by
myself."

*BASSETT and VALENTO Report Encounter with CW to BPD*

61. According to BPD records, BASSETT called BPD dispatch
on August 14, 2013 to report that CW had violated the
restraining order.  BPD records show that BPD officer Adam Chang
responded to the call by going to the Premises and interviewing
BASSETT and VALENTO.

62. According to Chang, BASSETT said that in the evening
of August 7, 2013, CW approached VALENTO and BASSETT and (a)
stated, "You need to drop the charges or I'm going to make your
life hell"; (b) threatened to reduce his child support payments;
and (c) demanded that BASSETT speak with the DA to drop the
domestic violence charges against him.

32

63.   According to Chang, BASSETT gave him a written affidavit, which stated, under "penalty of perjury": (a) CW stated that BASSETT "must refuse to testify and if compelled to testify then I should lie and say nothing happened"; (b) on August 7, 2013, "a friend, Anthony Valento and I were walking ... to get something to eat" when CW approached them and "insisted that the charges needed to be dropped."

64.   According to Chang, VALENTO related to him that in the evening of August 7, 2013, CW approached VALENTO and BASSETT and (a) asked BASSETT to drop the charges against him; and (b) stated that if BASSETT did not drop the charges against him, he would reduce his child support payments and "make [BASSETT's] life hell."

65.   I have reviewed the recording of the encounter between CW, BASSETT, and VALENTO on August 7, 2013.  Based on my review of this recording, at no time during the encounter did they talk about CW's criminal case, whether BASSETT would speak to the DA, or what would happen to BASSETT if she did not speak to the DA.

*BASSETT's Conversation with the District Attorney*

66.   Tamia Hope is the Pasadena Deputy District Attorney assigned to prosecute CW's criminal cases.  According to Hope, BASSETT told her (unlike what VALENTO had represented to CW) that she was not trying to get the criminal charges against CW dropped.  Hope said that BASSETT reported that CW had offered

33

her money in hopes of getting CW's charges dropped.  Hope stated

that she had spoken with VALENTO two or three times in regard to

CW's criminal case.  According to Hope, VALENTO said that he was

friends with both BASSETT and CW, and that he wanted Hope to

meet BASSETT.  Hope stated that VALENTO identified himself to

her as a Burbank Police officer.

> *VALENTO Misrepresents His Whereabouts, Falsifies Traffic*
> *Stops, and Disables a GPS Device on His BPD Vehicle While*
> *He Spends Time at the Premises*

67.  According to BPD Internal Affairs ("BPD-IA") records,

a BPD lieutenant reported on or about May 21, 2013 that he

suspected that VALENTO was neglecting his duties based on

VALENTO's delayed response to two police calls.  According to

BPD-IA Lieutenant Armen Dermenjian, he attempted to research

VALENTO's response times using BPD's GPS devices, which are

equipped on BPD's marked cars.  He discovered, however, that the

devices on the marked cars assigned to VALENTO were not sending

signals.  Indeed, it appears that VALENTO took steps to disable

the devices so that BPD would not record his marked cars'

whereabouts while he was on duty.  For example:

a.  On June 26, 2013, Dermenjian stated that he found

the device disconnected after VALENTO's shift.

b.  On July 1, 2013, Dermenjian reported that he re-

connected the device before VALENTO's shift began, but

discovered that it was disconnected after VALENTO's shift had finished.

      c.  On both July 9, 2013 and July 22, 2013, the device ceased working during VALENTO's shift; Dermenjian stated that he found it disconnected after VALENTO's shift ended.

    68.  Dermenjian stated that he began installing a GPS device on the marked car that VALENTO used for his shift. Using this GPS device and physical surveillance, BPD-IA determined that on 13 work days from June 10, 2013, to July 31, 2013, VALENTO misrepresented his whereabouts for approximately 23 hours and 29 minutes while on duty.[7] According to GPS records and surveillance, VALENTO's marked car was parked outside of the Premises during these times.

    69.  BPD records show that VALENTO falsified traffic stops during this time period as well. For example, VALENTO recorded on his daily log that he conducted a traffic stop on June 11,

---

   [7] While on duty, BPD police officers generally are allowed to take a specified amount of breaks. They must, however, be available to respond to police calls during their breaks. Further, BPD policy requires officers to report their location during the breaks so that their dispatcher and supervisors may find them if it is necessary for the officers to respond to a call during the break. Out of the approximate 23 hours and 29 minutes that the GPS device showed that VALENTO's marked car was parked outside of the premises, VALENTO was on break for approximately 6 hours and 15 minutes. In other words, VALENTO was on duty and not on break for more than 17 hours that his marked car was parked outside of the Premises. During many of his official breaks, BPD records show that VALENTO claimed that he was taking his break at Staci's house while his marked car was actually parked at the Premises according to GPS records. In addition, according to BPD-IA Sergeant Scott Meadows, BPD records show that during the June 10, 2013 to July 31, 2013 time period, VALENTO never reported being at the Premises.

2013 at 12:55 a.m. of "Allison Mathers" and provided her with a warning.  VALENTO's daily log shows that this stop occurred at the intersection of Olive and Verdugo in Burbank.  The California Division of Motor Vehicles, however, does not have a record of anyone named Allison Mathers.  Further, BPD's computer system has no record of VALENTO calling in a traffic stop of anyone at this time.  Additionally, VALENTO did not record this traffic stop.[8]  Indeed, the GPS device shows that VALENTO's marked car was parked outside of the Premises, which is located approximately two miles from where VALENTO claimed to be conducting the traffic stop.

70.  Additionally, VALENTO recorded on his daily log that he conducted a traffic stop on June 26, 2013 at 8:05 p.m. of "Brett Shouldis" for not having a license plate and provided him with a warning.  VALENTO's daily log shows that this stop occurred at the intersection of Third and Delaware in Burbank. The California Division of Motor Vehicles, however, does not have a record of anyone named Brett Shouldis.  Further, BPD's computer system has no record of VALENTO calling in a traffic stop of anyone at this time.  Additionally, VALENTO did not record this traffic stop.

---

[8] Pursuant to BPD policy, its employees generally should record conversations occurring during traffic stops and other field enforcement activity.

36

*FBI Interviews of VALENTO and BASSETT*

71.  On August 21, 2013, FBI Special Agent David Dahle and I interviewed VALENTO at the Burbank Police Department.  During the interview:

a.   With respect to the police reports he filed on behalf of BASSETT in regards to CW, VALENTO claimed that he informed a sergeant that VALENTO was "friends with both of them" and asked "what do you want me to do?"  VALENTO stated that the sergeant replied that VALENTO should "report" his conversations.[9]

b.   VALENTO stated that he was not dating BASSETT and that he and BASSETT "have never been anything but ... but good friends."

c.   VALENTO claimed that he stays at his "parents' house" a majority of the time.

d.   VALENTO said that BASSETT has never threatened CW while VALENTO had been in their presence and did not know where CW came up with that idea.  VALENTO stated that he had never heard that BASSETT was going to have someone else hurt CW. VALENTO said that CW "asked me about something like that and I

---

[9] I have interviewed 11 of BPD's 12 sergeants, including Sergeant Parrinello, who responded to the National property as described above. Not one sergeant recalls VALENTO informing him that he was friends with BASSETT or CW.  A majority have informed me that if he had known that VALENTO had a personal relationship with CW and/or BASSETT, he would have removed VALENTO from the case and would not have told him to write a report.  With respect to the response to the National property, Sergeant Parrinello stated that VALENTO informed him that VALENTO's wife knew BASSETT from the gym. Sergeant Parrinello said that if VALENTO had informed him that VALENTO himself was friends with BASSETT, he would have had someone else take the report.

said 'I don't know what you're talking about ... where you got

that.'"  VALENTO claimed that he did not "know why he thought it

was said.  He's just very paranoid."

72.  Also on August 21, 2013, FBI Special Agents Leah Marx

and Jason Dalton interviewed BASSETT at the Premises.  During

the interview:

a.  BASSETT stated that while she "was open to the

deal for the divorce, I never said I'm dropping the charges."

b.  She said that during the night that CW

encountered BASSETT and VALENTO walking on the street, which was

August 7, 2013, CW stated, "If I get jail time, I'm gone."  I

have listened to the recording of that encounter, which I have

described in paragraph 58, and I have heard no comments by CW in

which he indicated that he would flee if he were sentenced to

jail.

c.  BASSETT also stated that CW informed her that

evening, "'I'm going to make your life hell if you don't do

this,' like, quote .... 'Drop the charges.'  The whole thing

he's been saying all along."  I have listened to the recording

of that encounter, which I have described in paragraph 58, and I

have heard no comments by CW in which he said that he would make

BASSETT's life hell.

d.  BASSETT stated that she has been close friends

with VALENTO since November or December 2012.  Additionally,

BASSETT informed the agents that she is "in the hiring process" for BPD and that VALENTO is helping BASSETT with that process.

e.   BASSETT stated that she does not know how VALENTO's wife feels about their relationship, but BASSETT "think[s] we're all just friends."

f.   BASSETT stated that she and VALENTO are "not dating" and "have not ever dated." She stated that they have "no sexual relationship." BASSETT said that VALENTO "doesn't live here. He has his own house." BASSETT claimed that VALENTO "has never spent the night."

g.   BASSETT said that she knew that the FBI would be asking these questions because CW has been making these allegations.

h.   BASSETT stated that she has never threatened CW. BASSETT has never said anything that would give CW a reason to believe that she was threatening him. She never said that she had a friend with tattoos and if CW did anything to hurt her or her reputation then that friend would not be happy.

i.   BASSETT claimed that VALENTO has never paid for breast augmentation surgery for BASSETT. BASSETT said she has not had a breast augmentation procedure.

j.   BASSETT said that VALENTO has never given her any gifts or money.

73.   After Special Agent Dalton informed BASSETT that lying during a federal investigation is a crime, BASSETT said that "everything I told you is definitely true."

74.   BASSETT informed the agents that she printed out copies of text messages between VALENTO and CW, and that VALENTO has them as well.   BASSETT said that she keeps "a file" and that she has "lots of files."

### BASSETT Admits Relationship and that VALENTO Paid for Her Elective Surgery

75.   On or about August 23, 2013, BASSETT contacted Special Agent Marx on the telephone and stated that she wanted to "clarify" a few statements she made during her interview. BASSETT stated that she was nervous during the interview and that she did not answer all of the questions honestly because she was a little embarrassed.

76.   BASSETT stated that she and VALENTO are dating. BASSETT said that the relationship was "not serious," but she felt it was important to clarify her previous statement that she and VALENTO were just friends.   In addition, BASSETT stated that she did have breast augmentation surgery and that VALENTO paid for this surgery.   According to BASSETT, she was "a little uncomfortable" about the question during the first interview. BASSETT said that she and VALENTO have tried to keep the fact that they are dating quiet because CW is very jealous.   BASSETT

stated that the night CW followed BASSETT and VALENTO, CW told BASSETT that he was "going to make your life hell."   Based on my review of the recording of the encounter BASSETT is referring to, CW did not inform BASSETT that he would make her life hell.

77.   On or about October 4, 2013, BASSETT informed Special Agent Marx that she still lives at the Premises.

### Phone Record Analysis

78.   I have reviewed phone records from VALENTO's Phone, which show that VALENTO was in contact with BASSETT and CW on numerous occasions from September 27, 2012 to August 27, 2013. The records show that during this time period there were 1,018 calls and 64,665 text messages between VALENTO's Phone and the phone registered to GAYLE BASSETT.[10]   The records also show 157 calls and 290 text messages between VALENTO's Phone and the phone used by CW.

### Jurisdictional Issues

79.   According to website USASpending.gov, the City of Burbank has received more than $10,000 in federal program funds in the fiscal year of 2013, including a $16,875 grant from the Department of Justice on or about August 23, 2013 for "State and Local Law Enforcement Assistance."

---

[10] Phone records show that BASSETT's cell phone is registered to the Premises.

80.  Additionally, based on my training and experience, I
believe that VALENTO used interstate wires to carry out his
scheme to defraud the City of Burbank by lying about the hours
he was working.  For example, according to the City of Burbank's
payroll department, VALENTO's pay checks are direct deposited
into his checking account located in the Central District of
California through a Bank of America automatic clearing house
office in Virginia.

## IV.  Training and Experience on Digital Devices

81.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); and security devices.  Based on my
knowledge, training, and experience, as well as information
related to me by agents and others involved in the forensic

examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

44

space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

          e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,

programs, applications and materials contained on the digital

devices are, as described further in the attachments, called for

by this warrant.  Those records will not always be found in

digital data that is neatly segregable from the hard drive image

as a whole.  Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was

once on the hard drive but has since been deleted or edited, or

of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file).  Virtual memory

paging systems can leave digital data on the hard drive that

show what tasks and processes on the computer were recently

used.  Web browsers, e-mail programs, and chat programs often

store configuration data on the hard drive that can reveal

information such as online nicknames and passwords.  Operating

systems can record additional data, such as the attachment of

peripherals, the attachment of USB flash storage devices, and

the times the computer was in use.  Computer file systems can

record data about the dates files were created and the sequence

in which they were created.  This data can be evidence of a

crime, indicate the identity of the user of the digital device,

or point toward the existence of evidence in other locations.

Recovery of this data requires specialized tools and a

controlled laboratory environment, and also can require

substantial time.

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

82.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

V.    CONCLUSION

83.  For all the reasons described above, there is probable cause to believe that:

a.    BASSETT and VALENTO made materially false statements to the FBI in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of 18 U.S.C. § 1001(a)(2); and

47

b.    Evidence of violations of 18 U.S.C. §§ 1001(a)(2) (false statements); 1343 (wire fraud); and 666 (federal program bribery), as described above and in Attachment B-1 and B-2 of this affidavit, will be found in a search of the Premises and on the Person to be Searched, as further described above and in Attachment A of this affidavit.

_____
Jeffrey M. Bartel
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before
me this 11th day of
October, 2013.

ALICIA G. ROSENBERG

_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE